Pase 11, cast 4-1.  Let's see here, I don't care where anybody sits, but Mr. Hughes is represented by Ms. Kline and Ms. McManus, you were sitting over there with her. Although you are really the appellants in the case. Well I understand that. I don't care, as I said, I don't care where anybody sits, but could the government just not bring itself to sit there and she had to come sit with you? I think the government seems to be willing to let the amicus have the first and last say and if they want to do that they should be able to do it. That's okay, I just point out that the amicus is just odd. Okay, if that's the way you all want to proceed, we'll proceed. Good morning, your honor. May it please the court, Anthony Dick has court-appointed the amicus in defense of the judgment below. If I may, I'd like to reserve four minutes for rebuttal. So the background principle in federal criminal sentencing is that criminals who are convicted of a crime remain bound by the penalties that were in effect at the time of the offense. And that rule was put in place in 1871 in the Federal Savings Statute, and that rule remains in effect unless Congress has clearly indicated an intent to displace it. And so that's the question that I really want to focus this court's attention on this morning. Whether there is clear indicia of congressional intent to displace the Federal Savings Statute for criminals who not only committed their offense under the old penalties, but who also were initially sentenced under the old penalties. Is there clear indicia of congressional intent to displace the Federal Savings Statute for that category of offenders? I want to submit that the answer to that question is not only no, but it's clearly no. So the burden is on the opposing side to show clear indicia of congressional intent. I think even if the burden were on me to show clear indicia of intent, I would still win the case, or I should say that the judgment below would still be correct. Because the only time Congress has explicitly or clearly addressed this issue was in 3742G1 when Congress said that on sentencing on remand, criminals should remain bound by the penalties that applied as of the initial sentencing. And so there's no indicia of congressional intent that's anything close to clear to displace the Federal Savings Statute in this context. Now, the government and my opponent here rely on Dorsey, which I think at first blush appears to be on point, but I think it's important to recognize the reasoning of Dorsey. I use the term somewhat loosely because it's a six-factor balancing test, and it's not entirely clear what the relative weight of those factors is and which, if any, of those factors might be dispositive. But let's start with the holding itself, and it's on the first page of Ms. McManus' brief. Congress intended the Fair Sentencing Act's new lower mandatory minimums to apply to the post-act sentencing of pre-act offenders. Does it modify sentencing by saying initial? Just as a threshold matter, why aren't we bound to apply that arguably by its terms more broadly, and this is a post-act sentencing? There's a sentencing going on. It's after the act. Why aren't we bound by that? Well, that's right, Your Honor. So in Dorsey, the court does actually use the phrase initial sentencing at page 23. It does. Arguably, one could see that limited to the context of that paragraph, what they're talking about. So how do we get around this whole statement? Sure, absolutely. Because the court's factors in Dorsey, several of them were addressed specifically to the situation of initial sentencing. And so the question of sentencing on remand was simply not before the court in Dorsey. So it's dicta, I guess, as applied to this scenario. That's correct, and the court was acutely aware of the fact that the situation might be different on sentencing on remand because there is this special provision in the guidelines, 3742G1, where Congress expressly said that sentencing on remand should be treated differently from initial sentencing. And recall that when Congress said that, it thought the guidelines were mandatory, actually. It's only a result of the judicial remedy in Booker that the guidelines are no longer mandatory. So to the extent we're looking for congressional intent, the only time Congress has clearly addressed the question in this case, whether initial sentencing and sentencing on remand should be treated differently, Congress said, yes, they should be treated differently, that sentencing on remand should be governed by the penalties that were in effect at the time of the initial sentencing. So they should not be treated differently, right? Unless I'm getting mixed up here. I'm sorry. Right, that they should be treated differently. They should not. The initial and the remand sentencing rules should be the same, is what you're saying, not different. That's right. What I meant was for purposes of the Dorsey analysis, where Dorsey said that initial sentencing. You know, apart from what the result ought to be in this case, have you thought about this case is sort of bothering me, and I'll direct the same sort of inquiry to the United States. We're in a very, very, very odd posture. I mean, normally we rely on the adversarial process to bring to the court's attention the opposing points of view. And you're here arguing what is a very, very legitimate position in defense of the district court, but whether it's ultimately found to be correct or not, I don't know. But it would come out of not the normal adversarial process. At the same time, I don't think the government's agreement to the law being what the law is not controls the court. Have you thought about just kind of the institutional concerns that this case raises, and what would you say to us about that, if anything? I have, Your Honor. So the same situation was present in Dorsey, actually, where the court had to appoint an amicus, Miguel Estrada, a very capable advocate, to defend the judgment below because the government had abandoned that position. So I think in terms of the practice, it's clearly established by Dorsey itself. And so I would just say that there's a district court judgment that's in effect. I think the government has the clear authority to achieve the result it wants here by the exercise of the power of clemency. And the government does not have the power to ask you to misread a statute to reach the result that it would like. Can I say, this is a little half-baked, but it might just help me to understand 3742G and 3553A. So just take Dorsey itself and just say, okay, that was pre-act. So the time they were sentenced was 08. But Dorsey himself, I think it was G, Dorsey himself wins. He's told, you now get the benefit of these things, but you still have to be resentenced. Okay, so how did that work? I mean, I realize in Dorsey itself, I'm highly confident the district court gave him the benefit of the amendment, but I'm trying to figure out how that worked, given your argument. And trying to figure out, okay, so for Dorsey-type resentencings, you don't apply the 3742G, but for other types, you apply. So where's the language in 3742G that helps me get over that, what strikes me as slightly inconsistent but also understandable? Sure, sure. So Dorsey was sentenced in September 2010, initially. So he was sentenced post-act. I'm sorry, the crime, right. So all 3742G1 says is that on sentencing on remand, you should be sentenced in accordance with the penalties that were in effect as of the time of the original sentencing. So because of his original sentencing was September 2010 post-act, that he was post-act. But still pre-guideline change. Pre-guideline change, but post-act, which is when the court decided the effective date of the reduced mandatory minimums was August 3, 2010. So the court said he should have received the benefit of those reduced mandatory minimums when he was sentenced in September. I totally get that. So now he goes back for, he still has to have a resentencing. Exactly. So his resentencing, 3742G1 kicks in. Let's say his resentencing is in 2012. So you look at 3742G1, and it says apply the penalties that were in effect as of the time of his initial sentencing. Okay, so just the word you used was penalties. So what I was trying to figure out with 3742G is one could say that's only referring to guidelines. That's right. And if it is only referring to guidelines, the guidelines would have been the old guidelines. That's right. So there's a question about Dorsey in particular because he's in a somewhat unusual circumstance as of, you know, there's a small window of people who are sentenced between. I totally get that point. I get that complication in Dorsey itself. What I'm trying to figure out is I know Dorsey got the benefit of the new statute. It seems the only way that makes sense out of your argument in 3742G is that this language of, you know, you called it penalties. The rules somehow is picking up statutory changes. That's right. And the court said that you do pick up the statutory changes. So this is a way in which the reasoning in Dorsey is somewhat peculiar because it relied on the guidelines provisions, 3553A4A, which refers to guidelines only, and it relies on that provision to displace the statutory minimums. And the way it does that is because of the way the guidelines interact with the Fair Sentencing Act. And what Congress said in the Fair Sentencing Act is that we want to make the guidelines and the mandatory minimums consistent. Right? Okay. So therefore, because we want the guidelines and the mandatory minima to be consistent, and because the guidelines that are going to be applied are the ones that are in effect on the date of the initial sentencing, therefore the guidelines, in order to be consistent with the mandatory minima, must make the mandatory minima reduced to achieve that consistency. Okay. So then at the end of the court's opinion in Dorsey, they're confronted with this strange situation. Well, what about Mr. Dorsey? He was sentenced before the new guidelines were effective. And what does the court say? The court says, well, Congress said to make these guidelines changes effective as soon as possible, and it very well could have been the case that, you know, the Sentencing Commission had issued these guidelines immediately on August 3rd. And because of that possibility, that these new guidelines had been in effect on August 3rd, we want to allow for the possibility that those guidelines are going to be effective, and therefore Congress must have intended the reduced mandatory minimums to take effect immediately on August 3rd. Created a reality that did not in fact exist, sort of. That's right. But that's all in light of interpreting the statute. That's right. So what I'm trying to figure out is they didn't interpret 3742G, right? That's correct. And I'm trying to figure out how we can have Dorsey get resentenced, which does, that invokes 3742G. That's right. But the court was not addressing that situation. Oh, I totally get it. I'm trying to, you know, maybe, like I said, it's half-baked, but I'm still struggling with this. If you're right in today's case, what I'm struggling with is there will be resentencings where you apply the guideline rules at the initial sentence, and there will be Dorsey where you don't apply the guideline rules at the initial sentence. And that seems a little odd to me. No, I think, so I think for Dorsey's resentencing, so this is after the court decided Dorsey, and I don't think the court was paying close attention to this question, but so say you're the sentencing judge after Dorsey. I'm pretty confident he got the benefit of the reduced mandatory minimum. So they didn't apply the guidelines in place at the initial sentencing. No, I think they still would apply the guidelines. And I think the government would agree that they would still apply those old guidelines with the possible exception of, you know, the guidelines have been made retroactive, but I think that retroactivity cannot displace what 3742G1 says. So I think what may be the result of Dorsey, when Mr. Dorsey actually came up for his resentencing, the mandatory minimum had been reduced, but the sentencing court still would have been required to apply the old guidelines. And so you have the old guidelines. And then it's very downward? Exactly. The ability to vary downward as in Taylor. So they could vary downward from those guidelines. But oddly enough, you're conceding that the district court judge had the right at the resentencing in Dorsey itself not to vary downwards. Not to vary downwards? He had the right, of course, not to vary downwards. He also had the right to vary it. That's amazing, though. I agree. There's lots of things that are amazing about Dorsey and the aftermath of it. All right. Thank you. You'll have your rebuttal time, if that's what you want to call it. Thank you. May it please the Court, Jennifer McManus on behalf of the United States. Just to follow up on Judge Sutton's point, Mr. Hughes is in a materially indistinguishable position from Mr. Dorsey at resentencing. Of course, 3742G1 directs the district court in the initial instance to apply the guidelines that were in effect at the time of the original sentencing. That's what the language of the statute says. But the practical reality is that district judge is going to vary to what the new guidelines are. And I didn't go back to look. That would be a good thing to do, to go back and look and see what precise sentence Mr. Dorsey got. But I am almost certain that we will find that he got the benefit of the new guidelines as well. If he were to have been sentenced under the old guidelines, then he would perhaps file a motion under 3582C2 to get the benefit of the reduction. And why would a district court go through that? But there is a difference, right? Because Dorsey was initially sentenced after and Hughes was not. That's correct. That is correct. We think it's a difference that doesn't matter. But your point, Judge Sutton, I think, was that he was resentenced. He either has been or will be resentenced. And that the old guidelines for Mr. Dorsey technically apply because the new guidelines were not yet in effect at the time of his initial sentencing, even though it was post-act. Well, go ahead. You know, Dorsey expresses, emphasizes the, you know, the theme that runs through a lot of our sentencing jurisprudence of disparity. And if the relief that you seek on behalf of Mr. Hughes is granted, then Mr. Hughes will be sentenced differently from others who are in his precise situation, only by virtue of the fact that the Court of Appeals made an erroneous ruling that resulted in his initial, in the initial remand. It seems like we've treated identically situated people quite differently just based on a vagary without any, that just happened to occur to him. The facts of this case make it a hard one to decide what the right rule should be, of course, right? But the Supreme Court has noted, for example, in Pepper, that disparity that results from the normal appellate process is not the type of disparity that Congress has been concerned about in sentencing reform. Well, it's hard to know. It's hard to know which disparity in this case is a kind that's unacceptable and a normal part of the process and which disparity is unacceptable when Dorsey is applied. It's not all that clear. It is difficult because, as the Supreme Court said in Dorsey, no matter where we draw this line, there are going to be disparities. There's going to be disparities between people who were sentenced initially and resentenced prior to the passage of the Fair Sentencing Act. But in Dorsey, the court emphasized the type of disparity that we're really concerned about here is, quote, the imposition of disparate sentences involving roughly contemporaneous sentence, the same time, the same place, and even the same judge, thereby highlighting a kind of unfairness that modern sentencing statutes typically seek to combat. So Mr. Dorsey on resentencing, for example, will get the benefit of the new guidelines and the new minimums. Mr. Hughes should, too, because at the end of the day, the overriding theme of Dorsey. So how about this quick? How does Dorsey come out if this is the way the statutes worked? Okay, 109 is exactly the way it was then. 3553A is exactly the same except in one respect. A42 says that you apply the guidelines that are in effect on the date of the crime. Okay, so let's just say hypothetically that's what the statute had said. So you have 109, the anti-retroactivity rule. And then you have 3553A, which says, okay, we apply the guidelines in effect on the date of the crime, not the date the defendant sentenced, the date of the crime. So the point of that question is you now have both. Those two things were in tension in Dorsey. So in my hypothetical, they're both running in the same direction. So I assume that's a 9-0 case saying Dorsey loses, right? Because the tension's disappeared. 3553A says sentence on the guidelines in effect on the date of the crime. It's definitely a harder case. I don't understand how there's – I can't see one part of Justice Breyer's analysis that I don't understand how it could be anything but 9-0. The tension that he tries to resolve with other indicators, that's his whole point. That's his whole stepping-off point. So that statute eliminates it. Well, I think that those two of the six factors that look at 3553A24, that that becomes a harder issue. I'm not sure, because one of the principal... Well, you know why you're hesitating, because that hypothetical seems to be this case. On resentencings, because you have 109 telling you a rule which now lines up with a resentencing rule which is consistent with 109. Yeah, it is a hard question, but one of the other factors in Dorsey is this idea that one Congress cannot bind a later Congress. That was just in the dissent. I didn't see that in the majority. Did Breyer talk about that? I think so. Oh, did he? Okay. I think so, because the idea is that what we're trying to do is determine what did Congress intend in the Fair Sentencing Act? What was the express or necessarily implied intent of Congress in enacting the statute? And we're trying to figure out, by reference to various factors and background sentencing principles, what it was that Congress had in mind in terms of applicability of the act. Well, let me kind of, I guess, jump in on that. I mean, here's one way to sort of characterize this case, and tell me if you disagree. Mr. Dick has gone through the specific reasoning of the Dorsey court, sort of taking the opinion on its terms, and in his view, at least, shown why those reasons do not apply. This background principle, you know, some guidelines statute that now we're using to interpret some guidelines, a provision about guidelines, which we're now using to determine statutory retroactivity, has an exception, which applies to this case. So that background principle doesn't apply, arguably. And some of the other concerns that the Dorsey court goes through don't apply. So, you know, if one looks at the specific reasons, one can make a quite cogent argument that those reasons do not apply here. But on the other hand, we have sort of this practical reality, which I think is what you're getting at right now, which is like, come on, you know, Congress wants no more old crack sentences. And it's sort of the letter of Dorsey versus the spirit of Dorsey. But why aren't we stuck with the letter of Dorsey? And why shouldn't the background principle from this 1871 statute, Section 109, you know, why isn't that still there in this case? It is still there. Triumphant there. Well, what you have to do is you have to look at all of the background sentencing principles that are in play. I mean, it's true that Dorsey focused on 3553A42, which has that little exception for 3742G1. But, you know, let's look at the broader sentencing law. 3742G1 is a vestige of the Protect Act era. It barely survives constitutional scrutiny, and only because it has to be considered in conjunction with other sentencing statutes, 3661, 3553A1 and 2. The spirit of the day is normally not a governing principle in deciding cases. I mean, we can, as Judge Kethledge suggests, look at the spirit of the day. But the problem for us is that there's some things that Congress actually said, which put us on firmer legal footing than deciding the case, arguably, than deciding the case based on the spirit of the day. I'm not suggesting that the court has to decide this case based on the spirit of the day, although it certainly favors our position. But there is specific language in Dorsey that indicates that the Supreme Court was reading Congress's intent as expressed in the statute to conform the guidelines with the applicable law to exercise its emergency authority as indicating an intent to apply the new fair sentencing statute going forward for any district court imposing a sentence to apply that going forward. Well, you know, had Congress really been wrapped up in the spirit of the day, it could have been explicit about what the courts were to do with the folks who had been sentenced under the old regime. Well, sure, it could have been more explicit about what to do with people sentenced initially after the passage of the Act, but it wasn't. So we had before us the task of figuring out what was Congress's intent and what we can fairly infer it to be. In Dorsey, the Supreme Court said it wanted to avoid adopting an interpretation that Congress intended to require courts to impose upon the pre-Act offender a pre-Act sentence at a time after Congress had specifically found in the Fair Sentencing Act that such a sentence wasn't fairly long. This is in the discussion of the disparities. I mean, Amicus talks about two of the factors in Dorsey. The first one doesn't really matter too much because we all acknowledge there's no real express statement, and so we have to look at what Congress intended. And Amicus looks at those two factors that relate to 3553A24, and those are hard for us, but we've set forth in the brief the reasons why we think for statutory interpretation reasons why that doesn't necessarily hurt the position. Is the government's position on this case specific to this FSA, or would the government take this view in all cases in the future where you have a 109 debate, the defendant wins, and 109 doesn't apply, and is it the government's position that the argument you're making is not unique to the FSA, in other words, so that in all resentencing cases the only question is if at initial sentencing you get the benefit of this statute passed after the crime, you get the benefit of it, so in all resentencing, same rule? Is that the government's position? No, I would not frame it that broadly because this case involves a unique sentencing statute where the statutory minimums are tied to the guidelines in a way that makes it unique so that the amending purpose behind Dorsey is that in order to give effect to the Congress's intent to have the guidelines applied quickly and swiftly, as soon as possible after the act came into effect, you had to find that they intended the minimums or that wouldn't actually have any meaning. So if this argument doesn't apply in all cases, then it seems to take off the table the distinction between Dorsey and Hughes because that distinction would exist in all resentencings if you didn't apply the initial sentencing rules. So it seems to me you're either going to take this position in all resentencings where there's a set of rules now for the initial sentencing that have changed, and if you're not going to take that across the board, then I don't understand why we should care about Hughes or anyone else, the disparity between Hughes being sentenced today and someone else who, for whatever reason, gets the benefit of the FSA. We're certainly taking that position. I may have misunderstood you, but we certainly are taking that position with respect to all post-act resentencings. In any statute? Well, no, with respect to the Fair Sentencing Act. So maybe I didn't misunderstand you. Why aren't the emergency guidelines just irrelevant here? Because they would never apply to Mr. Hughes given, I think it's 3742G1. It's not true that they would never apply because they do apply. They were given retroactive applications, so they apply to him just like they do for everybody convicted. Well, I mean, we have a statute that says the guidelines that apply during a remand sentencing are those that apply at the initial sentencing. That's a statute, right? That's what the statute says. Okay, so it's a statute. And so that would apply to Mr. Hughes. No, because as this Court said in Taylor, they are advisory only. But we're talking about two different things, I think. Taylor says you can sort of consider the existence of those amended guidelines, but his range is still determined by the initial guidelines, the guidelines that were in effect at his initial sentence, right? Technically, that's true, right? Technically, except that the guidelines have retroactive effect. So he could file 3582G2 more often. Who cares? The statute says that the initial guidelines, the guidelines from the initial sentencing apply. I mean, are we talking about a guidelines provision that says these shall be retroactive? Yes. How does that trump the statute? Well, Congress gave... Yeah, they had all this emergency stuff, but there's no discussion of retroactivity, right? That's why we're here. No, but the guidelines do apply retroactively. And the point about Taylor is that the Court not only said that district courts can vary, right, but that 3742G1 only survives constitutional scrutiny under the post-broker jurisprudence to the extent that the Court has to consider any argument made by the defendant in requesting application of the new guidelines. But the fact that the Court considers changes in the guidelines does not change the applicable guideline. It merely means that that's a factor to be considered in deciding whether to apply the guidelines or whether to vary from them. That's better stated. Thank you. I mean, I don't think there's much debate on that point. She's correct, right? That's correct, but the whole point about... So we don't have the whole problem about, oh, my gosh, you know, the guidelines that apply to the sentencing are going to be out of whack with the mandatory minimum and so on. As Mr. Dick says in his brief, to the contrary, we have total harmony here between the mandatory minimums that he would say apply and the guidelines that apply. And you can sort of think about Taylor, but it doesn't matter because there's a mandatory minimum, and that's the way it goes with mandatory minimums. In other statutes, in 3661, for example, Congress has said that the District Court should take into account all relevant information, including relevant information about the conduct of the offense. And Taylor, the Court said that that includes the Sentencing Commission's most recent pronouncement as to what constitutes an appropriate sentence. But there's a mandatory minimum. So as in many cases where, you know, otherwise you'd get to think about things and so on, you run into a mandatory minimum. In this case, it really doesn't matter, right? I mean, isn't that... that's the way it is. There's only a mandatory minimum if this Court finds that Congress intended to, notwithstanding the fact that it clearly intended to apply the post-act minimums to every other person being sentenced... I think we're feeling the spirit... It's a question of statutory interpretation, so you have to look at what Congress really intended. Why can't you make the same statutory argument with 3582 and say that 3582 should be trumped? It's the same thing, right? 3582, the traditional law is you're out of luck because a statutory mandatory minimum prevents you from getting the benefit. But I don't know, I mean, the kind of argument you're making today is starting to get very close to saying, well, we can start to ignore 3582. No, because then there are other interests at play. But the spirit wouldn't permit us to ignore 3582, but the spirit might permit us to ignore some other statutory provision. Is that the argument? No. I have a technical question, which I think I know the answer to, and if anyone's unsure on either side, just let me know what I'm missing. But on 3742G, it seems to be all about the guidelines, right? So it's the guidelines in effect on the date of the first sentencing, right? So we're talking 3742G1, and this is one of the key provisions, and it refers to the guidelines at the beginning, then it ends by saying that we're in effect on such date, but it has this clause, together with any amendments thereto by any act of Congress. And I take it, this is where my question is, does that refer to statutes that directly amend guidelines? Is that all they're referring to? Yes. Okay. And AMICA suggests on pages 11 and 12 of his brief that that might actually apply to, for example, the statutory framework, the Anti-Drug Abuse Act, but we disagree with that, and we believe this clearly references Congress's ability to directly intervene and amend a guideline, as, for example, it has done with the Child Pornography Guideline. And is there a case that kind of shows that I don't have to worry about this, that you're right? I don't have a case for you right now. Okay. Okay, great. All right. Well, I'll let Mr. Dick, if he wants to respond. I just was trying to figure that out. Is this talking about directives that were enacted but have not yet been manifested as actual guideline amendments? As with the child porn, you know, Congress is always doing these directives. Is this talking about a directive has been passed the week before but it just hadn't been converted into an actual amendment to the guideline, but that directive and then guideline is going to apply? Is that what we're talking about? I don't know that that's what they're talking about because it says amendments thereto by any act of Congress that was in effect on such date, which would suggest, I think, that the guideline is in effect, but I think it's intending to carve out those amendments that Congress thinks are really important because they directly directed them. Okay. We'll let you loose. Okay. Anything else? All right. Thank you. Ms. Klein. Your Honors, may it please the Court, Suzanne Klein on behalf of Defendant Appellant Albert Hughes. I don't have really much to offer to add to the argument that we were dealing with regarding the application of the FSA. There was one smaller point in our appeal that I do want to just bring to your attention and that was related to the appropriateness of considering post-sentencing conduct progress that a defendant has made in sentencing. And I didn't want that to get lost because of the larger issue. The second issue in the blue brief? Yeah. And so that's been fully briefed. I would suggest because I think there's some disagreement about really what happened at sentencing in terms of looking at the transcript, I think it's going to guide the Court just to look at the language that the judge used. Our contention is that he declined to consider the post-sentencing progress that the defendant had made in part because he believed that at the most, the best it could help him out with would be a month. Well, it appears that he considered it. He just didn't agree with the defendant's position. I mean, he didn't . . . I mean, it's in the transcript. Yeah. Absolutely, I agree. And I think it's just a fine point. The Court can decide what it thinks the judge really did. Is it your position that Judge Yonker thought he lacked the power to consider the argument or would you recognize that he knew he had the power but just chose not to? I don't know. I don't know if he . . . But I think the important thing was that he declined to exercise it because it wouldn't have been a big deal. It would have been one month. I know that for certain. I can't tell you if he explicitly said, I have the power to do this and choose not to do it. I think I'd leave that to the Court for a fair reading of the transcript because my interpretation wouldn't really add to it. But I didn't want that point to get lost.  And the other thing that I wanted to mention, just in terms of disparity and Judge Gibbons, you brought this up and Ms. McManus did allude to it. Mr. Hughes was the sole defendant in this indictment. It's not a situation where there were other guys who were indicted who were sentenced at the same time. The point, and when we talk about disparity in sentencing, we're typically . . . among defendants in particular cases, the disparity in a sentencing concept is really not directed to folks who are in the same case. It's really directed to national disparity. So that really . . . I mean, it's helpful to know, but it's really not the controlling consideration when you think about the disparity issue, is it? No, I agree, Your Honor. I did just want to point that out because it is a distinction because so many indictments do involve multiple defendants where that would really be an issue. So one quick question. You have . . . how would this work? Let's say, you know, the government confesses error because of Sixth Circuit authority. The Sixth Circuit, you know, quote, vacates the sentence. But for whatever reason, they take it up on appeal. The governing law is corrected, not unlike this case. I take it either the U.S. Supreme Court or this court at that point could reinstate the sentence. In other words, effectively reverse the reversal, but their order says, in light of the new law and in light of the fact that it turns out the district court didn't violate any law, we, quote, reinstate the sentence. So if they've done that, this whole case goes away, right? Because . . . You mean if the court just says, looking at the law . . .  The appellate courts reinstate the sentence. So when it comes back down, there's no, quote, resentencing to be done. Am I right about that? That would be correct. Okay. So if the appellate courts can do that, I'm just curious, why couldn't Judge Yonker have just said by the time it got to him, hey, I got this right. There's nothing to be done. I'm just reinstating the sentence. He could have. But he chose not to. But if he did that, I mean, that implicates all the Dorsey stuff? I mean, it seems to me what you're doing is you're taking it out from under the post-August 3, 2010 stuff. Your Honor, I apologize if I'm not grasping the question. If you could maybe explain . . . Well, the point I'm making is it seems very strange to me, in this case as opposed to this general issue, that the district court got it right, right? The district court did it right the first time. The sentence should never have been vacated. But, Your Honor . . . You have to agree with me on that. The sentence should never have been vacated by the Sixth Circuit given existing law today. Correct. Okay. So it just seems very funny to me that appellate courts, had the timing worked out the right way, could have reviewed all this by, quote, reinstating the sentence. Then there's no resentencing. And if they can do that, I'm just a little puzzled as to why the district court can't say, why are you bothering me? I was affirmed. We're not doing anything. If you don't know, I don't know. That's why I'm asking. So you and I are in the same boat. I'm not getting the point. Arguably, in this particular case, there was no requirement for Judge Yonker to hold a new sentencing proceeding. Arguably, he could have issued an order reinstating the original judgment, which the Sixth Circuit had set aside. Mistakenly. Erroneously. So, you know, you wouldn't have had to have the defendant in. You wouldn't have had to permit argument. You wouldn't have had to do anything other than reinstate the original judgment. Well, Your Honor, if the remand were limited . . . If the remand were very limited to that particular aspect of the sentencing, but . . . Well, I mean, but the Court of Appeals remand was based on a circumstance that no longer existed and law that no longer existed by the time he came up for resentencing. But I think if you look at the language, Your Honor, and I could go back and look at it as well, I could be wrong, but I think the remand was a little bit more general than that.  because it would never have been . . . I think Judge Sutton's point . . . I don't want to argue with you, but I think the point is it never . . . It wouldn't relate to whether it's a limited general remand is the point I'm making. But anyway, I'm not sure . . . No, I apologize. I don't apologize. Okay. Anything else? No. Okay. All right, Mr. Dick. Thank you, Your Honor. So I'd like to begin by addressing Judge Kethledge's point, which is that the sort of overall theme of the Fair Sentencing Act might counsel in favor of the government's position here. I would just emphasize that there is no zeitgeist exception to the Federal . . . I thought it was beltgeist. Is it zeitgeist? Is that the right . . . Well, you know, my German's a little rusty. I apologize. But the point is just that in every case where Congress reduces the penalty for a crime, there's going to be this seeming unfairness. So maybe I should just stick to English and say there's no unfairness exception to the Federal Savings Statute. What we require is a clear statement of congressional intent, and we don't have anything close to that here. What about this emergency guidelines provision? Now, granted, we had the exchange earlier that the revised guidelines, the emergency guidelines technically would be inapplicable to Mr. Hughes in a resentencing. But why isn't the existence of that provision, sort of an extraordinary provision, emergency guidelines, why isn't that an indication of Congress's desire to have everybody sentenced after the date of the act be sentenced according to that regime? Well, I guess the answer there would just be that there's always the authority to vary from guidelines. So it's clear under 3742G1 . . . Why isn't it an indicator of larger, Congress's larger purpose to have no more old crack sentences after the passage of that act? Well, because 3742G1 says you still have to apply those old guidelines. So at very best, the emergency guidelines authority is going to be in initial sentences where those are going to be applied, not in old sentences. So the government's position, as far as I can tell, is that when Dorsey focused on the language about making the guidelines consistent with the mandatory minimum, that we should extend that to say that what Congress really meant is that we should make the mandatory minimum consistent with the ability to vary downward from the guidelines. So it's not about consistency with which guidelines to apply. Let me ask Judge Keflin, maybe I'm asking the same question, I'm not sure. I take it you would agree in the FSA they could have trumped 3742G1. Absolutely. Okay. So I take his question to be the emergency nature of this. Yes, it says guidelines in effect on that date, but then you make them hyper-retroactive. Why isn't that an indicator that they were effectively trumping? Sure. I would say, again, the same clear statement rule would apply. If there's going to be an implicit repeal of 3742G1, you would want it to be clear. And I just don't see anything resembling a clear statement of that in saying you should go ahead and promulgate emergency guidelines. And what Dorsey found is that that means they were worried about initial sentences that might happen immediately in the aftermath of the effective date. And so I would just say the clear statement principle, or the clear indication of congressional intent principle here, is an insurmountable obstacle because it's not clear what they meant. So I think the court's obligation is to try to read statutes to be consistent with one another and to only find an implied repeal if that's the necessary implication. In other words, if the two statutes cannot possibly be read in a consistent manner. And here I think it's very possible, and indeed the most plausible reading is that they're consistent, that what they said in Dorsey was that we apply the law in effect at the time of the initial sentence. It doesn't matter what the law may have been in the past. And if you look at 3742G1, it's essentially saying the same thing going forward. We apply what was in effect at the time of the initial sentence. It doesn't matter what's happened with the law afterwards. So it's just a clear rule that what governs is the law as of the time of the initial sentencing. What's your take on the phrase in 3742G1 about any amendments thereto? Is that congressional amendments directly of guidelines? Right. So the first thing I would say is that this provision is in no way necessary to the position I've taken here. I think it does present something of a difficult question of statutory interpretation that this court doesn't need to resolve. So if I were writing an opinion, I might not reach out and resolve the question unnecessarily. But I do think if this court found itself compelled to answer that question, it is most natural to read that as referring to not just direct amendments but also statutes where Congress has modified mandatory minima, which are themselves a type of amendment to the guidelines, and where Congress has directed the Sentencing Commission to amend the guidelines. So Congress can amend the guidelines either directly or indirectly. And in the Fair Sentencing Act, I think it's most natural to refer to the Fair Sentencing Act as an indirect amendment of the guidelines. It did that in two ways. One, change the mandatory minima, which are kind of the internal structure. Why does all this hurt you? I mean, why doesn't all this mean that on resentencing, you would consider the Fair Sentencing Act and its effect on the guidelines? Well, it says on such date. And so that's talking about the date of the previous sentencing. So it's telling the court to apply the guidelines in conjunction with the sentencing statutes. So the Anti-Drug Abuse Act. But that raises the question, how did you think this helped you? Well, it helps me because it's telling you to apply the guidelines and the statutes and the guidelines amendments that were in effect. And so I think the way we frame it in the brief is as a negative inference. It's telling you to apply amendments to the guidelines that were in effect on the date of the initial sentencing. And so basic principles of statutory interpretation would say, you know, the converse of that is you don't apply the amendments that were not in effect on that date. Well, Dorsey has this background principle that, you know, looking at the Sentencing Reform Act of 1984 and applying, you know, I forget, whatever that background principle was, you know what I'm talking about. And this is an exception to that background principle in your view, right? That's why it matters for you? That's exactly right. I just want to make sure I got your argument. Yeah, it not only negates that factor in Dorsey, but I think affirmatively cuts the other way. And this is especially important because the court said in Dorsey, you know, hey, this is a close case. We have to find clear indicia of congressional intent. It's close because of these feeding language. And here not only are several of these factors negated, including the sentencing cliffs, which the fifth factor in Dorsey was extremely important. If you look at the argument with Miguel Estrada, that was one of the issues that he had most difficulty with. You know, there's this crazy cliff system that would have been created in Dorsey. Here it's just not present. So I think that factor is negated. But in terms of the guidelines, they actually cut the other way because you're applying the old guidelines. So consistency here demands applying the old mandatory minimum. Okay. I think we're at the end of the argument at least. It's been an honor to appear before this panel. I appreciate it. I want to say first to you, Mr. Dick, we certainly appreciate your having accepted the appointment as amicus in the case and appreciate your advocacy on behalf of the district court, an unusual position for you to be in, but we're very appreciative. Ms. Klein, we appreciate your having accepted the representation of Mr. Hughes under the Criminal Justice Act and appreciate your advocacy on his behalf. We will certainly consider the case carefully. Thank you all for your argument.